**United States District Court**
For the Northern District of California

1

2

3

4

5                           UNITED STATES DISTRICT COURT

6                          NORTHERN DISTRICT OF CALIFORNIA

7

8    UNITED STATES FIDELITY AND                No. C-03-5376 SBA (EMC)
     GUARANTY COMPANY, *et al.*,

9
                 Plaintiffs,                    **ORDER GRANTING PLAINTIFFS'**
10                                              **MOTION FOR JUDGMENT**
          v.
11                                              **(Docket No. 222)**
     THE SCOTT COMPANIES, INC., *et al.*,
12
                 Defendants.                    RELATED TO
13   _____/

14   UNITED STATES FIDELITY AND                No. C-06-5590 EMC
     GUARANTY COMPANY, *et al.*,
15
                 Plaintiffs,
16
          v.
17
     ROBERT NURISSO, *et al.*,
18
                 Defendants.
19   _____/

20

21        On September 12, 2006, Plaintiffs filed a motion for judgment in Case No. C-03-5376 SBA

22   against Mr. Guglielmo and Mr. Nurisso.  On the same day, Plaintiffs filed a complaint against Mr.

23   Guglielmo and Mr. Nurisso (among others), alleging fraudulent transfer of assets based on the same

24   set of facts underlying the motion.  *See* Case No. C-06-5590 EMC.  Judge Armstrong determined

25   that Cases Nos. C-03-5376 SBA and C-06-5590 EMC were related.  Subsequently, the parties

26   consented to the undersigned's jurisdiction for Case No. C-06-5590 EMC and further consented that

27   the undersigned's resolution of the motion for judgment in Case No. C-03-5376 EMC would be

28   deemed the trial in Case No. C-06-5590 EMC.

**United States District Court**

For the Northern District of California

This order shall serve as both a ruling on Plaintiffs' motion for judgment in Case No. C-03-5376 SBA and as findings of fact and conclusions of law in Case No. C-06-5590 EMC. For the following reasons, the Court hereby **GRANTS** Plaintiffs' motion for judgment in Case No. C-03-5376 SBA and finds that there was a fraudulent transfer as alleged in Case No. C-06-5590 EMC. The various evidentiary objections made by the parties are denied as moot as the Court does not rely on any evidence to which there was an objection. For the same reason, Defendants' motion to strike the report of Plaintiffs' expert is denied as moot.

## I.   FACTUAL & PROCEDURAL BACKGROUND

A.   Case No. C-03-5376 SBA and Arbitration

On November 26, 2003, Plaintiffs filed suit against, *inter alia*, Joseph A. Guglielmo and Robert Nurisso in Case No. C-03-5376 SBA. *See* Docket No. 1 (complaint). Plaintiffs alleged that, under written indemnity agreements, Mr. Guglielmo and Mr. Nurisso, among others, were required to reimburse Plaintiffs for losses Plaintiffs incurred in connection with certain bonds. *See id.*

At about the same time, Plaintiffs initiated an arbitration proceeding against, *inter alia*, Mr. Guglielmo and Mr. Nurisso. *See* Johnson Decl. ¶ 9. According to Plaintiffs, the individual Defendants, among others, had agreed to reimburse Plaintiffs for any losses Plaintiffs occurred in connection with a $25 million loan guarantee bond. *See id.* ¶ 6. Plaintiffs sought to recover their payment of $25 million under the terms of the loan bond. *See id.* ¶¶ 6-7.

On or about October 27, 2004, the arbitrator in the arbitrator proceeding issued an advance notice of decision on a motion for summary judgment that Plaintiffs had filed before him. *See id.* ¶ 11. In the notice, the arbitrator advised that he was granting Plaintiffs' motion for summary judgment. *See id.*; *see also* Pls.' Ex. B (Tab 15) (advance notice).

On December 14, 2004, the arbitrator issued his final decision and award, in which he awarded Plaintiffs $7,825,000 against Mr. Guglielmo and $6,900,000 against Nurisso. *See* Johnson Decl. ¶ 12; *see also* Pls.' Ex. B (Tab 2) (final decision and award).

B.   Global Settlement and Terms of Settlement Agreement

On March 22, 2005, a settlement conference was held in Case No. C-03-5376 SBA, and a global settlement -- resolving not only the pending lawsuit but also the arbitration -- was reached.

**United States District Court**
For the Northern District of California

1  *See* Docket No. 211; Supp. Johnson Decl. ¶ 5.  The final settlement agreement became effective

2  September 14, 2005.  *See* Pls.' Ex. B (Tab 5) (hereinafter "Settlement Agreement").

3       Under the terms of the settlement agreement, Mr. Guglielmo and Mr. Nurisso represented

4  that their assets were fully and accurately set forth on their sworn financial statements dated March

5  21, 2005.[1]  *See* Settlement Agreement § 3.  Mr. Guglielmo and Mr. Nurisso intended for Plaintiffs to

6  rely solely on their representations in the financial statements, and Plaintiffs relied solely on the

7  representations in the financial statements in accepting from the two Defendants an amount less than

8  their alleged individual liabilities.  *See id.* ("St. Paul is [relying on the representations in the

9  financial statements] regardless of whatever information that St. Paul or its representatives may

10  have, if any, or learn in the future regarding Guglielmo's and Nurisso's respective financial status.").

11       In Mr. Guglielmo's financial statement of March 21, 2005, he listed as an asset a 60%

12  interest in a limited partnership called Guggs Investments, LP, valued at $1,022,582.  *See* Pls.' Ex. B

13  (Tab 17) (financial statement).  The specific assets held by Guggs were not listed on the financial

14  statement.

15       In Mr. Nurisso's financial statement of March 21, 2005, he listed as an asset a limited

16  partnership called Wild Horse, LP, valued at $2,227,808.  *See id.* (Tab 16) (financial statement).

17  The specific assets held by Wild Horse were not listed on the financial statement.  In addition to

18  Wild Horse, other assets identified in Mr. Nurisso's financial statement included interests in two

19  promissory notes owed by Roseville Fuel Plaza.  The interests in the notes were valued at $0.  *See*

20  *id.*

21       Because, under the settlement agreement, Plaintiffs were relying solely on the

22  representations in Mr. Guglielmo and Mr. Nurisso's financial statements in accepting a lesser

23  amount, the parties agreed that Plaintiffs were allowed to conduct an asset investigation post-

24  settlement.  *See* Settlement Agreement § 4.  If Plaintiffs discovered an "unlisted" or "undervalued"

25  asset, they were entitled to certain remedies.

26

27       [1] The settlement agreement actually refers to financial statements dated March 22, 2005.
28  However, the financial statements attached to the settlement agreement both list the date as March 21, 2005.  *See* Settlement Agreement, Exs. B-C (financial statements).

3

**United States District Court**
For the Northern District of California

(1)      An unlisted asset is an asset in which Mr. Guglielmo or Mr. Nurisso had an ownership interest but which was not listed on the individual's financial statement. *See id.* § 5.2(A). If Plaintiffs identified an unlisted asset and reasonably believed that Mr. Guglielmo or Mr. Nurisso had an ownership interest with a fair market value of $200,000 or more, then Plaintiffs could seek a judgment for the fair market value of the unlisted asset in excess of $100,000. *See id.* § 5.2(B).

(2)      An undervalued asset is an asset in which Mr. Guglielmo or Mr. Nurisso had an ownership interest which was listed on the individual's financial statement but which had a fair market value that was understated as of the date of the financial statement (*i.e.*, March 21, 2005). *See id.* § 5.3(A). If Plaintiffs identified an undervalued asset and reasonably believed that Mr. Guglielmo or Mr. Nurisso undervalued the asset by 20% or more, then Plaintiffs could seek a judgment for the fair market value of the asset in excess of the 20% above the value listed in the financial statement. *See id.* § 5.3(B).

The parties agreed that, for either an unlisted or undervalued asset, Plaintiffs could apply for relief in this Court (before the undersigned) or in another court of competent jurisdiction. *See id.* §§ 5.2(C), 5.3(C).

In addition to the above, Plaintiffs were entitled to certain remedies for fraudulent transfers of assets. More specifically, if Plaintiffs identified a transfer of an interest in an asset that occurred on or after November 26, 2003 (*i.e.*, the date the lawsuit in Case No. C-03-5376 SBA was filed), and Plaintiffs reasonably suspected that the transfer was a fraudulent one as defined by California Code of Civil Procedure § 3439, then Plaintiffs could seek a judgment that the transfer was a fraudulent one and obtain any relief provided for by § 3439. *See id.* § 6.2. The suit could be filed in any court of competent jurisdiction. *See id.*

C.     <u>Post-Settlement Asset Investigation</u>

During the post-settlement asset investigation, Plaintiffs obtained more details about the limited partnerships identified in Mr. Guglielmo and Mr. Nurisso's financial statements.

For example, regarding Guggs, Plaintiffs learned, *inter alia*, that:

**United States District Court**

For the Northern District of California

(1)     Mr. Guglielmo claimed that the limited partnership was set up for estate planning purposes only.

(2)     The certificate of limited partnership for Guggs was not filed with the state until December 8, 2004.  *See* Pls.' Ex. B (Tab 9) (certificate of limited partnership).

(3)     According to the limited partnership agreement, the general partner was Ardis M. Guglielmo, Mr. Guglielmo's wife.  The limited partners were Mr. Guglielmo, as trustee of the Joseph A. Guglielmo revocable trust; Mrs. Guglielmo as trustee of the Katlynn-Michael Trust; and two of the Guglielmo's children.  *See id.* (Tab 4) (LP Agreement § 4).  As general partner, Mrs. Guglielmo had the "exclusive control over the business and management of the Partnership." *See id.* (Tab 4) (LP Agreement § 9.1).

(4)     As of the date of the financial statement (*i.e.*, March 21, 2005), Mr. Guglielmo, as trustee for the Joseph A. Guglielmo revocable trust, owned 30% of Guggs; his wife another 30%; and their children the remaining 40%.  *See id.* (Tab 9) (certificate of limited partnership); *see also id.* (Tab 4) (LP Agreement § 5.5).

(5)     As of the date of the financial statement, Mr. Guglielmo and/or his wife had contributed interests in the following assets to Guggs:

    (a)     **15700 S. McKinley Avenue, LLC (46.5%)**,[2] *see* Stegner Decl., Ex. H (operating agreement, Ex. A);

    (b)     **Hayes Cole, LP (10%)**, *see* Pls.' Ex. B (Tab 13) (Guglielmo Depo. at 90);

    (c)     **Westwood Property (1.32%)**, *see id.*; Pls.' Ex. F (Guglielmo Depo. at 79, 92); and

    (d)     **Two promissory notes from Mr. Nurisso (100%)**.[3]  *See* Pls.' Ex. B (Tabs 23-24).

---

[2] The operating agreement for McKinley listed only Mr. Guglielmo, and not his wife, as a member and owner.  While Mr. Guglielmo appears to claim that his interest in McKinley is community property, he has not provided any evidence establishing the claim of community property.  *See* Cal. Fam. Code § 760 ("Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property.").

[3] On the face of the notes, Mrs. Guglielmo, and not Mr. Guglielmo, was the lender.  As above, however, Mr. Guglielmo seems to claim that the notes are community property.

The first note -- from Mr. Nurisso to Mrs. Guglielmo -- was in the amount of $100,000 and was dated September 1, 2004.  The note bore interest at a rate of 8% per annum.  *See* Pls.' Ex. B (Tab 23)

**United States District Court**
For the Northern District of California

1   It is not clear from the record when exactly all of these interests were transferred to Guggs.  They

2   appear to have been made in late 2004 or 2005.  *See, e.g.*, Guggs Decl. ¶ 28 (stating that the Guggs

3   LP Agreement was signed on December 9, 2004); Pls.' Ex. B (Tab 12) (transfer of membership

4   interest in McKinley from Mr. Guglielmo to Guggs, dated December 20, 2004).

5          With respect to Wild Horse, Plaintiffs learned, *inter alia*, that:

6   (1)    Mr. Nurisso claimed that the limited partnership was set up for estate planning purposes

7          only.

8   (2)    The certificate of limited partnership for Wild Horse was not filed with the state until March

9          11, 2005.  *See id.* (Tab 6) (certificate of limited partnership).

10  (3)    According to the limited partnership agreement, the general partner was both Mr. Nurisso

11         and his wife, Virginia Nurisso.  The limited partners were Mr. Nurisso and his wife, as

12         trustees of the Robert T. Nurisso and Virginia M. Nurisso Revocable Trust, and their

13         children.  *See id.* (Tab 3) (LP Agreement § 4).  As general partner, Mr. and Mrs. Nurisso had

14         the "exclusive control over the business and management of the Partnership."  *See id.* (Tab 3)

15         (LP Agreement § 9.1).

16  (4)    As of the date of the financial statement (*i.e.*, March 21, 2005), Mr. Nurisso and his wife, as

17         trustees of the Robert T. Nurisso and Virginia M. Nurisso Revocable Trust, owned 96% of

18         Wild Horse and his children the remaining 4%.  *See id.* (Tab 6) (certificate of limited

19         partnership); *see also id.* (Tab 3) (LP Agreement § 5.5).

20  (5)    As of the date of the financial statement, Mr. Nurisso and/or his wife had contributed

21         interests in the following assets to Wild Horse:

22

23

24

25
_____

26  (promissory note).

27         The second note -- also from Mr. Nurisso to Mrs. Guglielmo -- was in the amount of $100,000
    and was dated November 9, 2004.  The note also bore interest at a rate of 8% per annum.  *See id.* (Tab

28  24) (promissory note).

**United States District Court**
For the Northern District of California

(a)   **15700 S. McKinley Avenue, LLC (46.5%)**,[4] *see* Stegner Decl., Ex. H (operating agreement, Ex. A);

(b)   **Able Calvine Self Storage, LLC (50%)**,[5] *see* Stegner Decl., Ex. F (operating agreement, Ex. B); and

(c)   **Able Taylor Self-Storage, LLC (30%)**.[6] *See* Stegner Decl., Ex. G (operating agreement).

---

[4] The operating agreement for McKinley listed only Mr. Nurisso, and not his wife, as a member and owner. Similar to above, while Mr. Nurisso appears to claim that his interest in McKinley is community property, he has not provided any evidence establishing the claim of community property.

The LP agreement for Wild Horse indicates that the Nurissos owned only 44.64% of McKinley and each of their four children .465%, for a total of 46.5%. However, in opposing Plaintiffs' motion for judgment, Mr. Nurisso never challenged Plaintiffs' assertion that he and/or his wife owned 46.5%. Moreover, based on the deposition of Mr. Guglielmo, it is likely that the Nurissos gave their children part of their 46.5% just prior to formation of Wild Horse. *See* Pls.' Ex. F (Guglielmo Depo. at 77-78) (indicating that Guglielmos' children obtained partial interests in McKinley just prior to formation of Guggs LP). Both Mr. Nurisso and Mr. Guglielmo had the limited partnerships set up by the same attorney, James M. Sullivan.

[5] The LP agreement for Wild Horse indicates that the Nurissos owned only 48% of Able Calvine and each of their four children .5%, for a total of 50%. However, in opposing Plaintiffs' motion for judgment, Mr. Nurisso never challenged Plaintiffs' assertion that he and/or his wife owned 50%. Moreover, based on the deposition of Mr. Guglielmo, it is likely that the Nurissos gave their children part of their 50% just prior to formation of Wild Horse. *See* Pls.' Ex. F (Guglielmo Depo. at 77-78) (indicating that Guglielmos' children obtained partial interests in McKinley just prior to formation of Guggs LP). Both Mr. Nurisso and Mr. Guglielmo had the limited partnerships set up by the same attorney, Mr. Sullivan.

[6] The LP agreement for Wild Horse indicates that the Nurissos owned only 28.8% of Able Taylor and each of their four children .3%, for a total of 30%. However, in opposing Plaintiffs' motion for judgment, Mr. Nurisso never challenged Plaintiffs' assertion that he and/or his wife owned 30%. Moreover, based on the deposition of Mr. Guglielmo, it is likely that the Nurissos gave their children part of their 30% just prior to formation of Wild Horse. *See* Pls.' Ex. F (Guglielmo Depo. at 77-78) (indicating that Guglielmos' children obtained partial interests in McKinley just prior to formation of Guggs LP). Both Mr. Nurisso and Mr. Guglielmo had the limited partnerships set up by the same attorney, Mr. Sullivan.

**United States District Court**
For the Northern District of California

1   It is not clear from the record when exactly these assets were transferred to Wild Horse.[7]  They

2   appear to have been made in late 2004 or 2005.[8]  *See, e.g.*, Nurisso Decl. ¶ 23 (claiming that all

3   parties had signed the Wild Horse LP Agreement by July 1, 2004); Sullivan Decl. at 12 (claiming

4   that all parties had signed the Wild Horse LP Agreement by December 2004; Pls.' Ex. B (Tab 8)

5   (transfer of membership interest in McKinley from Mr. Nurisso to Wild Horse, dated January 20,

6   2005).

7       Plaintiffs further learned, as part of the post-settlement asset investigation that both Mr.

8   Guglielmo and Mr. Nurisso took "two-tier" discounts in valuing the interests held in Guggs and

9   Wild Horse.  According to the individual Defendants, each took a two-tier discount based on the

10  advice of counsel, Mr. Sullivan.  *See, e.g.*, Guglielmo Decl. ¶¶ 41, 46, 54; Nurisso Decl. ¶ 37;

11  Sullivan Decl. at 26.

12      According to Mr. Sullivan, he applied a two-tier discount based on a consultation with an

13  appraisal/valuation firm in the San Francisco Bay Area.  *See id.*  Mr. Sullivan does not dispute that

14  he did not ask the firm to do an independent valuation of the various assets of Mr. Nurisso and Mr.

15  Guglielmo; rather, Mr. Sullivan just applied the same procedure that had been used by the firm for a

16  different estate worth approximately $80 million.  *See id.* at 26-27 & Ex. I.

17      Mr. Sullivan described the two-tier discounting during the depositions of Mr. Guglielmo and

18  Mr. Nurisso.  For example, at the deposition of Mr. Guglielmo, held on November 28, 2005, Mr.

19  Sullivan stated as follows:

20          You understand the value of the entity by itself, the
            partnership, or the LLC, McKinley LLC, that is typically given a 15
21          percent discount value.  Then that come in to Gugg's [sic] and to Wild
            Horse.  It gets another 30 percent value of the 85 value, because you

22

---

23      [7] The Court acknowledges Plaintiffs' contention that Wild Horse did not exist until the certificate
        of limited partnership was filed with the state -- *i.e.*, until March 11, 2005 -- and that, therefore, any
24      transfers to Wild Horse prior to that date were ineffective.  However, this technical argument is not
        material to the issue before the Court.  The question is whether the value of the identified asset was
25      properly stated.  Its technical status at the time of transfer does not alter the analysis.

26      [8] Mr. Sullivan claims that the Able properties were transferred prior to January 15, 2004.  *See*
        Sullivan Decl. at 18.  However, this seems to be an error or at least is not credible given that Mr. Nurisso
27      represented that all parties had not signed the LP agreement for Wild Horse until July 2004.  *See* Nurisso
        Decl. ¶ 23.  Mr. Sullivan actually claimed that all parties had not signed the agreement until December
28      2004.  *See* Sullivan Decl. at 12.

1  have two its.  One, you've got a partnership.  That in itself gets a 15
2  percent discount.  Then it goes to the next partnership, and that gets
   the larger discount because that's the end-of-the-road discount.  So
3  you get one at one level and another at the ultimate ownership level.

4  Pls.' Ex. B (Tab 13) (Guglielmo Depo. at 56).  Similarly, at the deposition of Mr. Nurisso, held on

5  December 12, 2005, Mr. Sullivan stated:

6  So, . . . the entities [*e.g.*, Able Taylor] by themselves were discounted
   because of the lack of marketability and market salability.
7
          Then when they were owned by the family limited partnership,
8  the family limited partnership in itself has a right to an additional
   discount.  The additional discount is based on the same parameters of
9  all of the issues just mentioned, and those parameters are lack of
   salability, lack of marketability, et cetera, and all of the other criteria
10 that fall under the discount value.

11          So we have one tier by itself entitled solely and exclusively by
   itself, the 15 percent.  And then when that entity is owned by a family
12 limited partnership, you get another discount because you're even
   further diluting the salability of the property for purposes of gift,
13 inheritance and actual value.

14 *Id.* (Tab 14) (Nurisso Depo. at 114-15).

15      The actual discounts taken by Mr. Guglielmo for Guggs were a 15% first-tier discount and

16 then an additional 40% discount.  The actual discounts taken by Mr. Nurisso for Wild Horse were a

17 20% first-tier discount and then an additional 40% discount.  For each individual Defendant, the

18 40% discount -- as indicated by Mr. Sullivan's statements above -- reflected the fact that the LLC or

19 partnership interests were being held in a family limited partnership (*i.e.*, Guggs or Wild Horse).

20      Finally, as part of the post-settlement asset investigation, Plaintiffs learned more details

21 about the two Roseville Fuel Plaza promissory notes in which Mr. Nurisso had an interest.

22      On September 12, 2006, Plaintiffs filed a motion for judgment in Case No. C-03-5376 SBA

23 against Mr. Guglielmo and Mr. Nurisso, asserting that assets related to Guggs and Wild Horse were

24 not listed on the financial statements, that assets related to the limited partnerships were

25 undervalued, and that there had been fraudulent conveyances of assets as a result of the individual

26 Defendants' establishing the limited partnerships.  *See* Docket No. 222.  Plaintiffs also argued that

27 the promissory notes owed by Roseville Fuel Plaza (listed on Mr. Nurisso's financial statement

28 only) were undervalued.

1   On the same day, Plaintiffs filed a complaint against Mr. Guglielmo and Mr. Nurisso (among

2   others), alleging fraudulent transfer of assets based on the same set of facts.  *See* Case No. C-06-

3   5590 EMC.  Judge Armstrong determined that Cases Nos. C-03-5376 SBA and C-06-5590 EMC

4   were related.  Subsequently, the parties consented to the undersigned's jurisdiction for Case No. C-

5   06-5590 EMC and further consented that the undersigned's resolution of the motion for judgment in

6   Case No. C-03-5376 EMC would be deemed the trial in Case No. C-06-5590 EMC.

**II.   DISCUSSION**

A.   Jurisdiction

9   This Court has jurisdiction to resolve Plaintiffs' motion for judgment in Case No. C-03-5376

10  SBA because the parties provided for such as part of their settlement agreement.  *See Kokkonen v.*

11  *Gurdian Life Ins. Co. of Am.*, 511 U.S. 375, 380-81 (1994) (stating that a court has ancillary

12  jurisdiction to enforce a settlement agreement when the parties agree to continuing or retention

13  jurisdiction).

14  This Court also has jurisdiction to resolve Plaintiffs' claim for fraudulent transfer in Case

15  No. C-06-5590 EMC based on diversity jurisdiction.  (Neither Mr. Guglielmo nor Mr. Nurisso has

16  contested subject matter jurisdiction.)  Furthermore, this Court has jurisdiction because all parties

17  have consented to proceeding before a magistrate judge.

18  All parties have consented that the Court's resolution of the motion for judgment in Case No.

19  C-03-5376 shall be deemed the verdict of the bench trial in Case No. C-06-5590 EMC.

B.   Fraudulent Transfer to Guggs and Wild Horse

21  California enacted the Uniform Fraudulent Transfer Act, *see* Cal. Civ. Code § 3439 *et seq.*,

22  in 1986.  *See Lyons v. Sec. Pac. Nat'l Bank*, 40 Cal. App. 4th 1001, 1020 (1995).  Section 3439.01 of

23  the Act defines various terms as used in the Act, including the word "transfer."  Under the statute,

24  "'[t]ransfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary,

25  of disposing of or parting with an asset or an interest in an asset, and includes payment of money,

26  release, lease, and creation of a lien or other encumbrance."  Cal. Civ. Code § 3439.01.

27

28

**United States District Court**
For the Northern District of California

10

**United States District Court**

For the Northern District of California

Section 3439.04 of the Act sets up three independent types of fraudulent transfers -- more specifically, three types which do not require proof of the debtor's insolvency.[9]  *See id.*; *Reddy v. Gonzalez*, 8 Cal. App. 4th 118, 123 (1992).  They are as follows:

(1)     A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor.  *See* Cal. Civ. Code § 3439.04(a)(1).

(2)     A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.  *See id.* § 3439.04(a)(2)(A).

(3)     A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.  *See id.* § 3439.04(a)(2)(B).

The first type of fraudulent transfer is labeled "actual fraud."  *See Lyons*, 40 Cal. App. 4th at 1020.  It does not require proof of anything more than an actual intent to defraud.[10]  *See Reddy*, 8

---

[9] Section 3493.05 addresses transfers resulting in a debtor's insolvency.  *See* 8 Witkin Cal. Proc. Enf. Judgm. § 469.

[10] Case law suggests that so long as the intent to defraud was a motivating factor for the transfer, that is enough to show a fraudulent conveyance.  *See Slater v. Bielsky*, 183 Cal. App. 2d 523, 527-28 (1960) ("The question of intent on the part of the grantor which makes a conveyance in fraud of creditors void, is one for the trier of the fact.  The evidence does not show, and the findings properly disclaim, any such intent on the part of the plaintiff . . . .  On the contrary, it is apparent that the motivating factor in the plaintiff's transfer, and that upon which he relied, was decedent's representation that the conveyance to her should be made for convenience . . . ."); *see also Mejia v. Reed*, 97 Cal. App.

United States District Court

For the Northern District of California

1    Cal. App. 4th at 123.  Although there is a split in decisional authority in California as to whether the

2    intent must be established by clear and convincing evidence or a preponderance of the evidence, the

3    prevailing view seems to be that the appropriate standard of proof is a preponderance of the

4    evidence.[11]  *Compare Gagan v. Gouyd*, 73 Cal. App. 4th 835, 839 (stating that the standard is

5    preponderance of the evidence), *disapproved on other grounds by Mejia v. Reed*, 31 Cal. 4th 657

6    (2003); *Whitehouse v. Six Corp.*, 40 Cal. App. 4th 527, 530 (1995) (same), *with Reddy*, 8 Cal. App.

7    4th at 123 (stating that the standard is clear and convincing).  In determining actual intent, a court

8    may give consideration to, *inter alia*, eleven different "badges of fraud," which are listed in §

9    3439.04(b).  *See* Cal. Civ. Code § 3439.04(b).

10        The second and third types of fraudulent transfer are labeled "constructive fraud."  *See*

11   *Lyons*, 40 Cal. App. 4th at 1020.  In determining whether a debtor received reasonably equivalent

12   value for a transfer, a court compares the value of the property transferred with the value of what the

13   debtor received in exchange for the transfer.  *See Nasr v. Geary*, No. CV 94-8288-JFW (RNBx),

14   2003 U.S. Dist. LEXIS 13887, at *62-63 (C.D. Cal. June 9, 2003).  "Reasonably equivalent value 'is

15   to be judged from the standpoint of the creditors of the debtor.'"  *Id.* (quoting 1986 legislative

16   committee comment for California Civil Code § 3439.03).

17        Remedies for a fraudulent transfer are governed by § 3439.07.  That statute provides that a

18   creditor may obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the

19   _____

20   4th 277, 308 (2002) ("[A]n inference that the property division was motivated by an intent to put assets
     out of Plaintiff's reach may be reasonably drawn from the fact that the MSA was executed less than a
21   month after Husband first incurred the child support debt.").

22   [11] *Compare also Liodas v. Sahadi*, 19 Cal. 3d 278, 289 (1977) (stating that, for any civil fraud
23   case, the standard is preponderance of the evidence), *with Aggregates Associated, Inc. v. Packwood*, 58
     Cal. 2d 580, 588 (1962) (noting that, "[w]hile it is true that proof of fraud may, and must often be, made
24   by circumstantial evidence, it remains true that actual fraud must be proved by clear and convincing
     evidence and that 'where the circumstances of the transfer comport equally with the theory of honesty
25   and fair dealing, fraud will not be found'").

26        In *Liodas*, the California Supreme Court rejected the statement it made in *Aggregates* that the
     standard of proof is clear and convincing evidence.  *See id.* at 292-93 (noting, *inter alia*, that the
27   language used in *Aggregates* "on this point was not well considered" and that "it was essentially
     dictum" because, "inasmuch as the opinion concludes that the evidence of fraud in *Aggregates* 'rises
28   no higher than mere surmise and conjecture,' the proof would have been insufficient as a matter of law
     even under the preponderance of the evidence test").

United States District Court

For the Northern District of California

1   creditor's claim."  Cal. Civ. Code § 3439.07(a)(1).  It also provides that a creditor may obtain "[a]ny

2   other relief the circumstances may require" -- "[s]ubject to applicable principles of equity and in

3   accordance with applicable rules of civil procedure."  *Id.* § 3439.07(a)(3).

4          1.      Transfer

5          In the instant case, the individual Defendants argue that no fraudulent transferred occurred

6   because no transfer occurred in the first place.

7          As noted above, § 3439.01 defines transfer as "every mode . . . of disposing of or parting

8   with an asset or an interest in an asset, and includes payment of money, release, lease, and creation

9   of a lien or other encumbrance."  Cal. Civ. Code § 3439.01; *see also Scholle v. Finnell*, 173 Cal.

10  372, 377 (1916) (noting that the word "transfer" "designates only those transactions which, as

11  between the parties, pass, or purport to pass, the title or right of possession to the property"; adding

12  that "[t]he transfer need not . . . be by a writing, but it must be such an act as vests the real or

13  apparent ownership of some interest in the transferee").  In *Gagan*, the court held that the transfer of

14  property by a married couple to a revocable trust was not a fraudulent transfer because the husband

15  and wife remained the beneficiaries and therefore they did not dispose or part with an asset or

16  interest in an asset.  *See Gagan*, 73 Cal. App. 4th at 842.  The court emphasized: "There is no

17  evidence in this case that the transfer by [husband and wife] to a revocable trust of which they were

18  the beneficiaries rendered the property unavailable to the creditors.  Property in a revocable trust is

19  subject to creditor claims to the extent of the debtor's power of revocation."  *Id.* (citing Cal. Prob.

20  Code § 18200, which provides that, "[i]f the settlor retains the power to revoke the trust in whole or

21  in part, the trust property is subject to the claims of creditors of the settlor to the extent of the power

22  of revocation during the lifetime of the settlor").

23         The Court finds that, for purposes of § 3439.01, the individual Defendants did make transfers

24  in taking their assets and putting them into the limited partnerships, Guggs and Wild Horse.

25         Undoubtedly, there was a transfer because, as a result of setting up Guggs, Mr. Guglielmo

26  and/or his wife effectively parted with 40% of their ownership in the assets at issue by conveying it

27

28

13

**United States District Court**
For the Northern District of California

1   to a new entity in which their children now own 40%.[12]  Similarly, as a result of setting up Wild

2   Horse, Mr. Nurisso and/or his wife effectively parted with 4% of their ownership interest in the

3   assets at issue by conveying it to a new entity owned in part by their children.

4       Furthermore, even with respect to the 60% ownership retained by Mr. Guglielmo and his

5   wife, and the 96% ownership retained by Mr. Nurisso and his wife (assuming the original interests

6   were in fact community property), there was a transfer.  Unlike establishment of a revocable trust,

7   those gifts were not revocable within the sole discretion of Mr. Guglielmo and Mr. Nurisso.  The

8   situation here is thus different from that in *Gagan*.  In *Gagan*, the property was moved by the couple

9   to a revocable trust of which they were the beneficiaries.  The property was readily available to

10  creditors as the trust was transparent to the creditors.  In the instant case, the property was not

11  simply transferred by the individual Defendants and/or their wives to revocable trusts of which they

12  were the beneficiaries.  Rather, in Mr. Guglielmo's case, the property was transferred to a limited

13  partnership, in which his wife was the sole general partner; Mr. Guglielmo became an owner only as

14  trustee of a revocable trust, which was a limited partner.  In Mr. Nurisso's case, the property was

15  transferred to a limited partnership, in which now he and his wife together acted as general partners;

16  they held equity ownership as trustees of a revocable trust, in the capacity of a limited partner.

17      More important, because Mr. Guglielmo and Mr. Nurisso put their ownership interests into a

18  limited partnership, the property was no longer readily available to creditors, as would be the case

19  had the property been conveyed to a revocable trust in which Defendants were sole beneficiaries.[13]

20  First, the property was no longer readily available because a "limited partner is given no property

21  interest in the specific partnership assets as such. . . . Thus, such assets are not available to satisfy a

22  judgment against the limited partner in his individual capacity."  *Crocker Nat'l Bank v. Perroton*,

---

[12] The fact that Mr. Guglielmo's financial statement expressly noted that he owned only 60% of Guggs is immaterial to whether there was a transfer.  The financial statement did not reflect that, previously, Mr. Guglielmo had owned 100% of the assets making up Guggs and that he gave his children 40% after November 26, 2003 (*i.e.*, cutoff date under the settlement agreement).

[13] A limited partnership "can generally be described as a type of partnership comprised of one or more general partners who manage the business and who are personally liable for partnership debts, and one or more limited partners who contribute capital and share in the profits, but who take no part in running the business and incur no liability with respect to partnership obligations beyond their capital contribution."  *Evans v. Galardi*, 16 Cal. 3d 300, 305 (1976).

1   208 Cal. App. 3d 1, 7 (1989) (internal quotation marks omitted); *see also* Cal. Corp. Code § 15671

2   ("An interest in a limited partnership is personal property and a partner has no interest in specific

3   partnership property."); *Evans v. Galardi*, 16 Cal. 3d 300, 307 (1976) ("[T]he limited partner has no

4   interest in the partnership property by virtue of his status as a limited partner.").  While the Uniform

5   Limited Partnership Act has a provision which allows for a limited partner to obtain the return of his

6   or her contribution under certain circumstances, *see* Cal. Corp. Code §§ 15510, 15516, the limited

7   partnerships in the instant case are governed by the California Revised Limited Partnership Act, *see*

8   Pls.' Ex. B (Tabs 3-4) (LP Agreements § 1) (providing for formation of LP under provisions of

9   California Revised Limited Partnership Act), and this Act does not appear to have any such

10  comparable provision.  Furthermore, under the limited partnership agreements for Guggs and Wild

11  Horse, "no Partner shall have the right to demand or receive property other than cash in return for

12  such Partner's cash contribution.  A Partner shall have the right to a return of all or any part of his

13  capital contribution only upon the termination and dissolution of the Partnership as provided in this

14  Agreement."  Pls.' Ex. B (Tabs 3-4) (LP Agreements § 5.4).

15          Second, the property interests placed into the family limited partnership were no longer

16  readily available because, while a creditor can reach the limited partner's interest in the partnership,

17  the creditor can do so only by obtaining a charging order from a court.  *See* Cal. Corp. Code § 15673

18  ("On application to a court of competent jurisdiction by any judgment creditor of a partner, the court

19  may charge the limited partnership interest of the partner with payment of the unsatisfied amount of

20  the judgment with interest."); *Crocker*, 208 Cal. App. 3d at 6 ("[A] judgment creditor must seek a

21  charging order to reach the debtor partner's interest in the partnership.").  "The charging order

22  procedure has replaced levies of execution as the remedy for reaching partnership interests."

23  *Hellman v. Anderson*, 233 Cal. App. 3d 840, 849 (1991) (noting that a court clerk "acts in a

24  ministerial capacity and has no discretion to refuse issuance of a writ of execution").

25          The fact that the ownership interests are not liquid or readily transferable is acknowledged by

26  Defendants and their experts; that is precisely the reason used to justify the 40% second-tier

27  discount (*i.e.*, because the assets were held in the Guggs and Wild Horse limited partnerships).  At

28

**United States District Court**

For the Northern District of California

1  bottom, the assets were placed into new legal entities with fractional ownership and limited rights,

2  making it more difficult for creditors to reach.  There was thus a "transfer."

3  The Court accordingly rejects Defendants' argument that no transfer took place when they

4  and/or their wives set up and made contributions to the limited partnerships, Guggs and Wild Horse.

5      2.   <u>Constructive Fraud</u>

6  Defendants contend that, even if there were a transfer, no fraudulent transfer occurred in the

7  instant case because there is no evidence of fraud.  According to Defendants, the badges of fraud, as

8  itemized in § 3439.04(b) of the Uniform Fraudulent Transfer Act, do not appear in their case.

9  The problem for Mr. Guglielmo and Mr. Nurisso is that, as noted above, § 3439.04(b) is only

10  applicable when there is a claim of actual fraud, not constructive fraud under § 3439.04(a)(2)(A) and

11  (B).  Here, although Plaintiffs have spent much of their time on the badges of fraud, they also have a

12  claim for constructive fraud.  Because as the Court finds below, Plaintiffs have met their burden of

13  proving constructive fraud, the Court holds that there was a fraudulent transfer when Mr. Guglielmo

14  and his wife transferred assets into Guggs and when Mr. Nurisso and his wife transferred assets into

15  Wild Horse.[14]

16  Under § 3439.04(a)(2)(B), there is constructive fraud if -- whether the creditor's claim arose

17  before or after the transfer was made or the obligation was incurred -- (1) the debtor made the

18  transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for

19  the transfer or obligation, and (2) the debtor intended to incur, or believed or reasonably should have

20  believed that he or she would incur, debts beyond his or her ability to pay as they became due.  Both

21  prongs are established in the instant case.

22  First, both Mr. Guglielmo and Mr. Nurisso (along with their wives) made the transfers

23  without receiving a reasonably equivalent value in exchange for the transfers.

24

25

---

26      [14] The Court does not make any conclusions as to whether or not Plaintiffs have met their burden

27  of proving actual fraud.  However, the Court does note that it has serious doubts as to Defendants' claim that they set up the family limited partnerships solely for estate planning purposes.  Because the Court

28  bases its conclusions upon a finding of constructive fraud, however, it does not resolve the question of actual fraud.

United States District Court

For the Northern District of California

1    For Mr. Guglielmo, with the transfer to Guggs, he and his wife gave up outright 40% of their

2    ownership in the assets.  In addition, with the transfer, Mr. Guglielmo gave up control over all of the

3    assets as his wife alone was named the general partner of Guggs.  The yielding of control with

4    respect to McKinley -- the largest asset held in Guggs by far -- is especially notable.[15]  Prior to its

5    transfer, Mr. Guglielmo only, and not his wife, was listed as a member and owner in the operating

6    agreement; this suggests that, even if McKinley were community property, prior to its transfer, Mr.

7    Guglielmo, and not his wife, exercised control over the property.  In exchange for the transfer of

8    assets to Guggs, in which Mr. Guglielmo gave up both ownership and control, he received in return

9    only a smaller share of the ownership of Guggs (more specifically, 30% as trustee for a revocable

10   trust).[16]

11   Moreover, as Mr. Guglielmo and his experts contend, the value of the assets was diminished

12   by the mere transfer into a limited partnership.  Under his own contention, wholly apart from

13   transferring ownership interests to his wife and children, the value of the partnership interest was

14   40% less than the value of the assets prior to the transfer.

15   Thus, Mr. Guglielmo did not receive reasonably equivalent value in exchange for the

16   transfer.  *Compare Barisich v. Lewis*, 226 Cal. App. 3d 12, 20 (1990) (concluding that a third party

17   did not fraudulently convey property to the plaintiff; noting that the third party received reasonably

18   equivalent value for interest in property that was transferred to the plaintiff because the third party

19   owed plaintiff $21,000 and a comparable interest in property had been sold for $20,000).

20   For Mr. Nurisso, with the transfer to Wild Horse, he and his wife gave up 4% of their

21   ownership in the assets.  Although Mr. Nurisso was named as general partner of Wild Horse along

22   with his wife, and thus did not relinquish all control, it is notable that he did give up some control

23   with respect to McKinley, the largest asset held in Wild Horse.[17]  Prior to its transfer, Mr. Nurisso

24

25   [15] Based on the numbers used for the financial statement, McKinley represented more than 75%
     of the value of the property held by Guggs.  *See* Sullivan Decl., Ex. I.

26

27   [16] Mrs. Guglielmo also received 30% of the profits as a limited partner.

28   [17] Based on the numbers used for the financial statement, McKinley represented almost 50% of
     the value held in Wild Horse.  *See* Sullivan Decl., Ex. I.

1    only, and not his wife, was listed as a member and owner in the operating agreement.  Thus, as noted

2    above with respect to Mr. Guglielmo, even if McKinley were community property, it appears that

3    Mr. Nurisso, and not his wife, exercised control over the property prior to its transfer.  Moreover, as

4    noted above, Mr. Nurisso and his experts contend that the value of the limited partnership is 40%

5    less than that of the assets prior to the transfer.  Accordingly, Mr. Nurisso did not receive reasonably

6    equivalent value in exchange for the transfer of assets to Wild Horse.

7         As above with respect to Mr. Guglielmo, Mr. Nurisso gave up both ownership and control

8    and, in return, received only a share of the ownership of Wild Horse (more specifically, 96% as co-

9    trustee for a revocable trust), and the ultimate value of the assets he owned after the transfer was

10   significantly diminished as a result of the transfer.

11        Second, both Mr. Guglielmo and Mr. Nurisso believed or reasonably should have believed

12   that they would incur debts beyond their ability to pay as the debts became due.  The transfers to

13   Wild Horse and Guggs did not take place until late 2004 and 2005, *see, e.g.*, Sullivan Decl. at 18

14   (stating that the transfer of McKinley was not accomplished until late 2004 because the transfer

15   documents were not timely received from Mr. Nurisso by Mr. Sullivan's law office) -- *i.e.*, after the

16   arbitrator had issued his advance notice of granting Plaintiffs' motion for summary judgment.  *See*

17   Pls.' Ex. B (Tab 15) (advance notice).  In fact, the transfer of the McKinley interest -- the asset of

18   greatest value for both Guggs and Wild Horse -- did not take place until after the arbitrator issued

19   his final decision and award, in which he awarded Plaintiffs $7,825,000 against Mr. Guglielmo and

20   $6,900,000 against Nurisso.  *See* Pls.' Ex. B (Tab 2) (final decision and award).

21        3.    Remedy

22        Having concluded that there were fraudulent transfers, the Court now turns to the issue of

23   remedy.  Under § 3439.07, a creditor may obtain "[a]voidance of the transfer or obligation to the

24   extent necessary to satisfy the creditor's claim."  Cal. Civ. Code § 3439.07(a)(1).  The Court, for

25   purposes of assessing whether assets were unlisted or undervalued, voids the transfers made to

26   Guggs and Wild Horse.

27

28

United States District Court
For the Northern District of California

18

United States District Court

For the Northern District of California

C.    Valuation of Assets

    1.    Mr. Guglielmo

Because the Court voids the transfer made to Guggs, 40% of the value of the assets held in Guggs are unlisted assets under the terms of the parties' settlement agreement. The financial statement only indicated a 60% interest in Guggs; it omitted the 40% interest Mr. Guglielmo owned prior to the transfer. The remaining 60% of the value of the assets held in Guggs are analyzed separately to determine whether it constituted undervalued assets.

    a.    McKinley

McKinley was appraised on April 18, 2005, at $6,670,000. *See* Pls.' Ex. B (Tab 18) (appraisal of McKinley's real property and fixtures by Hulberg & Associates); *see also* Stegner Decl., Ex. C at 50 (relying on appraisal by Hulberg & Associates); Lloyd Decl., Ex. F at Ex. A (relying on appraisal by Hulberg & Associates). Therefore, it is fair to say that, on the date of the financial statement (*i.e.*, March 21, 2005), McKinley was appraised at $6,670,000. The Court accepts this appraised value.

Separate from the real property and fixtures, McKinley had additional value because of cash assets that it held. Tellingly, even Mr. Nurisso's own experts, Jeff Stegner and Terry Lloyd, counted the cash assets as assets separate from the above valuations. According to Mr. Stegner, the cash assets were in the amount of $604,234. *See* Stegner Decl., Ex. C at 50. According to Mr. Lloyd, the cash assets were in the amount of $538,657. *See* Lloyd Decl., Ex. F at Ex. A. The Court shall use the latter value of $538,657 for the cash assets since Mr. Lloyd provided a specific explanation as to why this figure was used. *See id.* (noting that this figure came from the partnership's brokerage account statement).

Given that the outstanding mortgage for McKinley at the time was $2,462,802, *see* Sullivan Decl., Ex. I, McKinley had equity of $4,745,855 (*i.e.*, $6,670,000 + $538,657 − $2,462,802).

Mr. Guglielmo had a 46.5% interest in McKinley. Therefore, his equity interest in McKinley was worth $2,206,823 (*i.e.*, $4,745,855 x 46.5%).

This interest is entitled to one discount. It is not entitled to a second discount because the Court voids the transfer to Guggs. Mr. Guglielmo argues that the Court should take a first-tier

**United States District Court**

For the Northern District of California

1   discount consistent with the discounts taken by his experts, Mr. Stegner and Mr. Lloyd.[18]  However,

2   a first-tier discount of only 15% is more appropriate.  This was the discount claimed by Mr.

3   Guglielmo's own attorney, Mr. Sullivan.  Mr. Guglielmo fails to explain why the 15% discount

4   originally taken by Mr. Sullivan, after consultation with an appraisal/valuation firm, is inappropriate

5   and why the after-the-fact valuations done by his litigation experts are more appropriate.  The Court

6   finds Mr. Sullivan's valuation more credible than those of the litigation experts'.

7        Plaintiffs do not dispute that a first-tier discount of 15%, which Mr. Guglielmo took in

8   preparing his financial statement, is reasonable.  Accordingly, the Court shall apply only a first-tier

9   discount of 15%.  Mr. Guglielmo's interest in McKinley, at the time of the financial statement, was

10  therefore worth $1,875,800 (*i.e.*, $2,206,823 x 85%).

11            b.    Hayes Cole

12       The parties do not dispute that Hayes Cole sold its assets in the summer of 2005 and that Mr.

13  Guglielmo received a payment of $235,173 in cash as a result.  *See* Evans Decl. ¶ 42; Sullivan Decl.,

14  Ex. I; Guglielmo Decl. ¶¶ 49-50.  Absent any other competent evidence of the value of Mr.

15  Guglielmo's interest in Hayes Cole, this is the best indicator of the value of the asset since the sale

16  occurred in the summer of 2005, *i.e.*, shortly after the date of the financial statement.  *See* Guglielmo

17  *id.* ¶ 49.

18       Because the partnership had not been liquidated as of the date of the financial statement, this

19  interest is entitled to a first tier discount (but not a second discount).  As above, Mr. Guglielmo

20  argues that a first-tier discount in accordance with the discounts taken by his experts is appropriate.

21  However, for the same reasons stated above, the Court applies only a discount of 15% claimed by

22  Mr. Sullivan.  Accordingly, the value of Mr. Guglielmo's interest in Hayes Cole at the time of the

23  financial statement was $199, 897 ($235,173 x 85%).

24

25

26  ───────────────────

27       [18] The first-tier discounts taken by Mr. Stegner and Mr. Lloyd actually had two components:
     first, a discount for lack of control (approximately 20%) and then a separate discount for lack of
     marketability (20-35%).  For both Mr. Guglielmo and Mr. Nurisso, cumulatively, the first-tier discounts

28  taken by Mr. Stegner and Mr. Lloyd ranged from approximately 30-60%.

United States District Court

For the Northern District of California

c.      Westwood

Mr. Guglielmo estimated that, at or about the time of the financial statement, Westwood was worth $8,500,000.  *See* Evans Decl. ¶ 41(a); Sullivan Decl., Ex. I.  The value is not disputed.

Mr. Guglielmo had a 1.32% interest in Westwood.  Therefore, the value of Mr. Guglielmo's interest at the time was $112,200.

This interest is entitled to a first tier discount for partial ownership.  It is not entitled to a second discount because the Court voids the transfer to Guggs.  As above, Mr. Guglielmo argues that a first-tier discount in accordance with the discounts taken by his experts is appropriate.  However, for the same reasons stated above, the Court applies only a discount of 15%.  Accordingly, Mr. Guglielmo's interest in Westwood, at the time of the financial statement, was worth $95,370 (*i.e.*, $112,200  x 85%).

d.      Two Promissory Notes

As noted above, there were two promissory notes, each in the amount of $100,000, and each with interest of 8% per annum.  *See* Pls.' Ex. B (Tabs 23-24).  The first note was issued on September 1, 2004, and the second on November 9, 2004.  *See id.*  Mr. Sullivan apparently valued the two notes at $100,000 and $86,575.  *See* Sullivan Decl., Ex. I.  Although Mr. Nurisso's financial statement of March 21, 2005, reflects that the notes together were worth $157,239, *see* Pls.' Ex. B (Tab 16), there is no indication as to how this number was derived or whether, *e.g.*, payments had been made on the principle.  The Court finds that Mr. Sullivan was in the best position to value these notes.

The Court notes that Plaintiffs' expert, Stephen Evans, valued the two notes at $207,311.00 including "accrued interest."  Evans Decl., ¶ 43.  However, Mr. Evans did not provide any evidence or even make an express allegation that interest had not been paid.  Given that Plaintiffs have the burden of proof, the Court must conclude that Mr. Sullivan's valuation is correct.

This value of the two notes, $186,575, is not subject to any discount since ownership was not divided or held in a partnership.  The Court voids the transfer to Guggs, and, as the notes are not being held by any other entity (*e.g.*, LLC), Mr. Guglielmo cannot take any discount for lack of control or marketability.

United States District Court

For the Northern District of California

e.     Summary

The assets above total $2,357,642 (*i.e.*, $1,875,800 + $199, 897 + $95,370 + $186,575). Sixty percent of $2,357,642 is $1,414,585.  Forty percent of $2,357,642 is $943,057.

In his financial statement, Mr. Guglielmo did not account for 40% of the assets fraudulently conveyed (as found above) prior to the financial statement, and therefore those transferred assets are unlisted assets under the settlement agreement.  Because the 40% is worth more than $200,000, Plaintiffs are entitled to judgment in the amount of the fair market value that is in excess of $100,000.  *See id.* § 5.2(C)(3). $943,057 − $100,000 = $843,057.[19]

In his financial statement, Mr. Guglielmo claimed that his 60% of Guggs was valued at $1,022,582.  However, his 60% interest of the assets (subject to only a first tier discount) was worth $1,414,585 ($2,357,642 x 60%).  The assets were therefore understated by more than 20%. Accordingly, Plaintiffs are entitled to judgment in the amount of the fair market value that is in excess of 20% above the value listed in his financial statements (Settlement Agreement § 5.3(C)(3)): $1,414,585 − ($1,022,582 + (20% x $1,022,582)) = $187,487.

In sum, the total judgment in favor of Plaintiffs is **$1,030,544** (*i.e.*, $187,487 + $843,057).

2.     Mr. Nurisso

Although for the reasons stated above the Court is voiding the transfer made to Wild Horse as a constructive fraudulent transfer for purposes of enforcing the settlement agreement, unlike Mr. Guglielmo, Mr. Nurisso did not represent on the financial statement that he owned less than 100% of Wild Horse.  Accordingly, the 4% interest in Wild Horse conveyed to his children was not "unlisted."  Rather, the transfer affects the question of whether the value of his stated whole interest in Wild Horse was undervalued under the settlement agreement.  The effect of the Court's finding of fraudulent conveyance and voiding of the transfer of the 4% interest is to attribute 100% of the value of the assets to Mr. Nurisso in assessing the true value of his assets prior to the transfer.

---

[19] The Court notes that, in supplemental briefing, Plaintiffs provided a calculation as to what judgment they would be due from Mr. Guglielmo if only a one-tier discount were applied.  However, that calculation was made pursuant to the Court's request.  Plaintiffs did not waive any argument that there were unlisted assets as well as undervalued assets with respect to Mr. Guglielmo.

a.   <u>McKinley</u>

McKinley was appraised on April 18, 2005, at $6,670,000.  *See* Pls.' Ex. B (Tab 18) (appraisal of McKinley's real property and fixtures by Hulberg & Associates); *see also* Stegner Decl., Ex. C at 50 (relying on appraisal by Hulberg & Associates); Lloyd Decl., Ex. F at Ex. A (relying on appraisal by Hulberg & Associates).  Therefore, it is fair to say that, on the date of the financial statement (*i.e.*, March 21, 2005), McKinley was appraised at $6,670,000.  Again, the Court accepts this appraised value.

Separate from the real property and fixtures, McKinley had additional value because of cash assets that it held.  Tellingly, even Mr. Nurisso's own experts, Mr. Stegner and Mr. Lloyd, counted the cash assets as assets separate from the above valuation.  According to Defendants' expert Mr. Stegner, the cash assets were in the amount of $604,234.  *See* Stegner Decl., Ex. C at 50.  According to Defendants' expert Mr. Lloyd, the cash assets were in the amount of $538,657.  *See* Lloyd Decl., Ex. F at Ex. A.  The Court shall use the latter value of $538,657 for the cash assets since Mr. Lloyd provided a specific explanation as to why this figure was used.  *See id.* (noting that this figure came from the partnership's brokerage account statement).

Given that the outstanding mortgage for McKinley at the time was $2,462,802, *see* Sullivan Decl., Ex. I, McKinley had equity of $4,745,855 (*i.e.*, $6,670,000 + 538,657 − $2,462,802).

Mr. Nurisso had a 46.5% interest in McKinley.  Therefore, his equity interest in McKinley was worth $2,206,823 (*i.e.*, $4,745,855 x 46.5%).

This interest is entitled to one discount.  It is not entitled to a second discount because the Court voids the transfer to Wild Horse.  Like Mr. Guglielmo, Mr. Nurisso argues that the Court should take a first-tier discount consistent with the discounts taken by his experts, Mr. Stegner and Mr. Lloyd.  However, a first-tier discount of only 20% is appropriate as that is the figure used by Mr. Sullivan, Mr. Nurisso's attorney.  Mr. Nurisso fails to explain why the 20% discount originally taken by Mr. Sullivan, after consultation with an appraisal/valuation firm, is inappropriate and why the after-the-fact valuations done by his litigation experts are more appropriate.  Again, the Court finds Mr. Sullivan's assessment more credible than those of Mr. Nurisso's litigation experts.

United States District Court

For the Northern District of California

Plaintiffs do not dispute that a first-tier discount of 20%, which Mr. Nurisso took in preparing his financial statement, is reasonable.  Accordingly, the Court shall apply only a first-tier discount of 20%.  Mr. Nurisso's interest in McKinley, at the time of the financial statement, was worth $1,765,458 (*i.e.*, $2,206,823 x 80%).

>            b.    Able Calvine

Mr. Nurisso initially estimated that, at or about the time of the financial statement, Able Calvine was worth $6,000,000.  *See* Sullivan Decl., Ex. I.  This valuation was based on information provided to Mr. Nurisso by Gary Schulze, the co-owner.  *See* Nurisso Decl. ¶ 36.  Subsequently, Mr. Nurisso revised that figure and claimed that Able Calvine was worth $7,000,000.  *See* Sullivan Decl., Ex. I.  Mr. Nurisso has now submitted evidence from an expert, Ed Ryan, opining that, during the first quarter of 2005, Able Calvine was worth $6,000,000.  *See* Ryan Decl. ¶ 12.  Another expert, Carl Touhey, opined that, on March 21, 2005, Able Calvine was worth $5,400,000 to $5,600,000.  *See* Touhey Decl. ¶ 9.  The Court notes that neither Mr. Ryan nor Mr. Touhey, however, is an appraiser.  The Court concludes that Able Calvine was worth approximately $6,000,000.[20]  This value is consistent with the original valuation of the property by Mr. Nurisso/Mr. Schulze and with the valuation by Mr. Ryan.  Moreover, this value is not markedly inconsistent with the valuation by Mr. Touhey.

The Court further concludes that Able Calvine had additional value because it held cash assets in the amount of $105,612.  Tellingly, even Mr. Nurisso's own experts, Mr. Stegner and Mr. Lloyd, counted the cash assets as assets separate from the above valuations.  *See* Stegner Decl., Ex. C at 22; Lloyd Decl., Ex. D at Ex. B.

Given that the outstanding mortgage for Able Calvine at the time was $3,846,616, *see* Sullivan Decl., Ex. I, Able Calvine had equity of  $2,258,996 (*i.e.*, $6,000,000 + $105,612 – $3,846,616).

---

[20] The fact that Able Calvine ultimately was sold for approximately $5,600,000 in 2007 is not dispositive.  *See* Nurisso Decl. ¶ 41.  The question is what Able Cavline's fair market value was as of the date of the financial statement (*i.e.*, March 21, 2005).

**United States District Court**
For the Northern District of California

1    Mr. Nurisso had a 50% interest in Able Calvine.  Therefore, his equity interest in Able
2    Calvine was worth $1,129,498 (*i.e.*, $2,258,996 x 50%).

3    This interest is entitled to one discount.  It is not entitled to a second discount because the
4    Court voids the transfer to Wild Horse.  As above, Mr. Nurisso argues that a first-tier discount in
5    accordance with the discounts taken by his experts is appropriate.  However, for the same reasons
6    stated above, the Court applies only a discount of 20% applied by Mr. Sullivan.  Accordingly, Mr.
7    Nurisso's interest in Able Calvine, at the time of the financial statement, was worth $903,598 (*i.e.*,
8    $1,129,498 x 80%).

9                    c.    Able Taylor

10    Able Taylor was appraised in May 2005 at $6,830,000.  *See* Evans Decl. ¶ 40(d); Sullivan
11    Decl., Ex. I; Pls.' Supp. Br., Ex. A (Tab 6) (appraisal of real property by Seevers Jordan
12    Ziegenmeyer).  Therefore, it is fair to say that, on the date of the financial statement (*i.e.*, March 21,
13    2005), Able Taylor was appraised at $6,830,000.  The Court acknowledges that Mr. Nurisso's
14    experts, Mr. Ryan and Mr. Touhey, valued Able Taylor at the relevant time at $4,890,000 and
15    $5,500,000-$5,700,000, respectively.  *See* Ryan Decl. ¶ 6; Touhey Decl. ¶ 7.  However, the Court
16    credits the independent appraisal over the "appraisals" of the Defendants' litigation experts.[21]
17    Moreover, it is notable that Mr. Nurisso initially valued Able Taylor at $7,000,000 (subsequently
18    revised to $6,000,000), based on information provided to him by Mr. Schulze, one of the co-owners.
19    *See* Sullivan Decl., Ex. I; Nurisso Decl. ¶ 36.  The Court accepts the appraised value of $6,830.000.

20    The Court further concludes that Able Calvine had additional value (separate from the real
21    property) because it held cash assets in the amount of $71,192.  Tellingly, even Mr. Nurisso's own
22    experts, Mr. Stegner and Mr. Lloyd, counted the cash assets as assets separate from the above
23    valuations.  *See* Stegner Decl., Ex. C at 36; Lloyd Decl., Ex. E at Ex. B.

24    Given that the outstanding mortgage for Able Taylor at the time was $2,630,160, *see*
25    Sullivan Decl., Ex. I, Able Taylor had equity of $4,271,032 (*i.e.*, $6,830,000 + $71,192
26    − $2,630,160).

27

28        [21] As noted above, neither Mr. Ryan nor Mr. Touhey is an appraiser.

**United States District Court**
For the Northern District of California

1    Mr. Nurisso had a 30% interest in Able Taylor. Therefore, his equity interest in Able Taylor

2    was worth $1,281,310 (*i.e.*, $4,271,032 x 30%).

3    This interest is entitled to one discount. It is not entitled to a second discount because the

4    Court is voiding the transfer to Wild Horse. As above, Mr. Nurisso argues that a first-tier discount

5    in accordance with the discounts taken by his experts is appropriate. However, for the same reasons

6    stated above, the Court applies only a discount of 20% applied by Mr. Sullivan. Accordingly, Mr.

7    Nurisso's interest in Able Taylor , at the time of the financial statement, was worth $1,025,048 (*i.e.*,

8    1,281,310 x 80%).

9              d.    <u>Summary</u>

10    The assets above total $3,694,104 (*i.e.*, $1,765,458 + $903,598 + $1,025,048). In his

11    financial statement, Mr. Nurisso claimed that the value of his interest in the assets above as held in

12    Wild Horse, LP was $2,227,808 instead of $3,694,104. The assets were therefore understated by

13    more than 20%. Accordingly, Plaintiffs are entitled to judgment in the amount of the fair market

14    value that is in excess of 20% above the value listed in his financial statement. *See id.* § 5.3(C)(3).

15    $3,694,104 − ($2,227,808 + (20% x $2,227,808)) = $1,020,734.

16    The total judgment in favor of Plaintiffs is **$1,020,734**.

17    D.    <u>Roseville Fuel Plaza Promissory Notes</u>

18    Finally, as reflected in his financial statement of March 21, 2005, Mr. Nurisso held interests

19    in two promissory notes (50% each) owed by Roseville Fuel Plaza. *See* Pls.' Ex. B (Tab 16)

20    (financial statement).

21    Plaintiffs do not dispute the following facts with respect to the Roseville Fuel Plaza

22    promissory notes: In 2000, Mr. Nurisso along with Mr. Schulze started up Roseville Fuel Plaza as a

23    business venture. *See* Nurisso Decl. ¶ 46. Mr. Nurisso and his wife contributed $128,500 to

24    Roseville Fuel Plaza for the purchase of land, and his wife is a personal guarantor on a $1.3 million

25    SBA loan obtained by Roseville Fuel Plaza. *See id.* ¶ 48. Crown Point Apartments, jointly owned

26    by Mr. Nurisso and Mr. Schulze, loaned $736,086.42 to Roseville Fuel Plaza, and Able Calvine,

27    also jointly owned by the same, loaned $443,814.19 to Roseville Fuel Plaza. *See id.* ¶¶ 50-51. In

28    return, Roseville Fuel Plaza issued two promissory notes for those respective amounts. *See id.* ¶ 52

United States District Court

For the Northern District of California

& Ex. G (promissory notes). "The promissory notes bear interest at the rate of nine percent (9%) per annum and were to be paid over 120 months starting the first full calendar month following the date the permanent loan was funded." *Id.* ¶ 53; *see also id.* Ex. G (promissory notes).

Plaintiffs dispute, however, Mr. Nurisso's contention that the two promissory notes were worth, at the time of the financial statement, $0.

Plaintiffs acknowledged at the hearing before this Court that, as plaintiffs and the moving parties, they have the burden of proving that the promissory notes were undervalued as of the date of the financial statement. Plaintiffs have failed to meet their burden. In order for the Court to assess the value of the promissory notes as of March 21, 2005, it needs to know, *e.g.*, the fair market value of the Roseville Fuel Plaza and the priority of these two notes relative to other loans extended to Roseville Fuel Plaza including an SBA loan. Plaintiffs do not dispute that there is a SBA loan worth more than a million dollars. Without knowing the equity and relative priority of the notes, the market value of the notes cannot be assessed. Plaintiffs have provided no evidence or competent expert evidence on this matter.

Because Plaintiffs have not satisfied their burden of proving that the promissory notes are undervalued, Plaintiffs are not entitled to any judgment with respect to the notes.

E.      Attorney's Fees and Costs

Both Plaintiffs and Defendants seek attorney's fees and costs incurred based on the terms of the settlement agreement. *See* Settlement Agreement § 20 ("In the event that legal action becomes necessary or appropriate to enforce or interpret any part of this Agreement or seek remedy for breach thereof, the prevailing party shall be entitled to an award of reasonable attorneys' fees and costs incurred in seeking such enforcement or remedies."). Here, Plaintiffs are the prevailing parties. The Court hereby orders the parties to meet and confer regarding fees to determine if they can reach an agreement on fees in light of this order. If the parties are unable to reach agreement, the Plaintiffs shall file a motion with the Court by May 23, 2007 and notice the motion for June 27, 2007. The parties are forewarned that they should provide evidence such as contemporaneous time records to substantiate any claim for fees and costs.

**United States District Court**
For the Northern District of California

### III.   CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for judgment in Case No. C-03-5376 SBA and further finds that there was a fraudulent transfer as alleged in Case No. C-06-5590 EMC.

Accordingly, in Case No. C-03-5376 SBA, Plaintiffs are awarded a judgment in the amount of **$1,030,544** against Mr. Guglielmo and a judgment of **$1,020,734** against Mr. Nurisso.  The terms of the stipulated temporary restraining order signed by this Court on September 22, 2006 shall remain in effect until further order.

In Case No. C-06-5590 EMC, the Court declares the transfer of Nurisso Assets from R. Nurisso to Wild Horse LP and the transfer of the Guggs Assets from J. Guglielmo to Guggs Investments LP void as to Plaintiffs.  The Court also enters a judgment for Plaintiffs in the amount of **$1,030,544** against Mr. Guglielmo and a judgment of **$1,020,734** against Mr. Nurisso, provided, however, the Plaintiffs may not execute this judgment and the judgment in Case No. C-03-5376 SBA upon amounts which in the aggregate exceeds the judgment herein (*i.e.*, no multiple recovery shall be allowed).

The parties are ordered to meet and confer to discuss satisfaction of the judgments herein.  A status conference will be held on May 30, 2007 at 2:30 p.m.  A joint status conference statement shall be filed with the Court on May 23, 2007.

This order disposes of Docket No. 222 in Case No. C-03-5376 SBA.


IT IS SO ORDERED.


Dated:  May 10, 2007

_____
EDWARD M. CHEN
United States Magistrate Judge

28